EATON, J.
¶ 1. The State charged Keith Baird, defendant in this appeal, and two others with burglary, kidnapping, and first-degree murder for their involvement in the death of seventy-eight-year-old Mary O'Hagan on September 10, 2010 at her home in Sheffield, Vermont. The basis for defendant's murder charge was that the murder occurred during the commission of a burglary in which defendant participated and therefore constituted felony murder pursuant to 13 V.S.A. § 2301. Defendant filed a Vermont Rule of Criminal Procedure Rule 12(d) motion to dismiss the first-degree murder charge, arguing that the State could not establish a prima facie case because it could not show that defendant killed the victim or that he had the necessary mental state for first-degree felony murder. A deposition of Richard Fletcher, one of the codefendants, provided most of the admissible evidence in support of the State's opposition to the motion to dismiss; facts in the investigating police officer's affidavit of which he had first-hand knowledge *495 provided additional support for the State's opposition. Following a hearing, the court granted defendant's motion to dismiss. For the reasons stated herein, we reverse the dismissal, reinstate the first-degree murder charge, and remand for further proceedings.
¶ 2. When reviewing the grant of a Rule 12(d) motion to dismiss, this Court employs the same standard as the trial court. State v. Willard-Freckleton, 2007 VT 67A, ¶ 2, 183 Vt. 26, 949 A.2d 416. A motion to dismiss must be denied if, " 'taking the evidence in the light most favorable to the state and excluding modifying evidence, the state has [produced] evidence fairly and reasonably tending to show the defendant guilty beyond a reasonable doubt.' " State v. Fanger, 164 Vt. 48, 51, 665 A.2d 36, 37 (1995) (quoting Reporter's Notes, V.R.Cr.P. 29 ). Because the grant of a motion to dismiss precludes a jury from hearing any evidence and because a jury is in the best position to weigh facts and deliver a verdict, "courts should grant a judgment of acquittal only when there is no evidence to support a guilty verdict." State v. Cameron, 2016 VT 134, ¶ 5, --- Vt. ----, 163 A.3d 545. Thus, the issue before the trial court, and before this Court on appeal, is whether the State produced sufficient "substantial, admissible evidence" to prove beyond a reasonable doubt that defendant had the requisite mens rea for felony murder. V.R.Cr.P. 12(d)(2) ; see also Cameron, 2016 VT 134, ¶ 5, --- Vt. ----, 163 A.3d 545.
¶ 3. At common law, the felony-murder doctrine imputed an intent to murder when a death occurred during the perpetration of a felony, even if the death was an accident or otherwise unintentional. State v. Bacon, 163 Vt. 279, 291, 658 A.2d 54, 62-63 (1995) (citing 2 W. LaFave & A. Scott, Substantive Criminal Law § 6.7, at 145, § 6.8, at 159 (1986) ). The doctrine applied not only to the felon who caused the death but also to all accomplices in the underlying felony. Id. ; see also Tison v. Arizona, 481 U.S. 137, 159, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (Brennan, J., dissenting) ("This curious doctrine is a living fossil from a legal era in which all felonies were punishable by death; in those circumstances, the state of mind of the felon with respect to the murder was understandably superfluous, because he or she could be executed simply for intentionally committing the felony." (footnote omitted)). As we observed in State v. Doucette, however, "[a]s the common law developed, many more crimes became felonies, and many of these, such as tax evasion, larceny, and embezzlement, were not violent and did not involve a likelihood of causing death." 143 Vt. 573, 578, 470 A.2d 676, 680 (1983) ). Thus, this Court has interpreted the rule narrowly "to mitigate the harshness of the common-law felony-murder rule." Bacon, 163 Vt. at 291, 658 A.2d at 63 ; see also Doucette, 143 Vt. at 581, 470 A.2d at 682 (reasoning that Legislature intended to "limit the common law felony murder rule in order to restrict its harshness").
¶ 4. In Vermont, the applicable statute, 13 V.S.A. § 2301, precludes prosecution for first-degree murder based solely on evidence that a defendant intended to commit one of the enumerated felonies.[1] See Bacon, 163 Vt. at 291, 658 A.2d at 63 (holding that "the mere showing that a person intended to commit one of the felonies enumerated in § 2301 is insufficient to convict the person of felony murder"); Doucette, 143 Vt. at 582, 470 A.2d at 682 (same). In addition to proving the defendant's *496 intent to commit one of the enumerated felonies, the State must also establish that the defendant had one of the mental states for second-degree murder: the intent to kill, the intent to do great bodily harm, or "a wanton disregard for human life with respect to the murder itself." Bacon, 163 Vt. at 291, 658 A.2d at 63 ; see also State v. Sexton, 2006 VT 55, ¶ 17, 180 Vt. 34, 904 A.2d 1092,overruled on other grounds by State v. Congress, 2014 VT 129, 198 Vt. 241, 114 A.3d 1128. The theory behind Vermont's limitation is that the State must prove the individual liability of each felon because it " 'is fundamentally unfair and in violation of basic principles of individual criminal culpability to hold one felon liable for the unforeseen and unagreed-to results of another felon.' " Bacon, 163 Vt. at 292, 658 A.2d at 63 (quoting People v.Aaron, 409 Mich. 672, 299 N.W.2d 304, 327 (1980) ). Requiring the State to prove, at a minimum, wanton disregard for human life in a first-degree felony-murder prosecution is also consistent with the U.S. Supreme Court's recognition that
some nonintentional murderers may be among the most dangerous and inhumane of all-the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill."
Tison, 481 U.S. at 157, 107 S.Ct. 1676.
¶ 5. Thus, in Vermont, so long as the State establishes that a defendant had the requisite mental state for a second-degree murder conviction, any "murder" committed during the perpetration of an enumerated felony constitutes first-degree murder, regardless of whether the defendant caused the killing. Bacon, 163 Vt. at 291, 658 A.2d at 63. If the State proves that a defendant had the intent to commit an enumerated felony, that a murder occurred during the commission of that felony, and that the defendant had, at minimum, a wanton disregard for human life, 13 V.S.A. § 2301 makes the defendant guilty of murder in the first degree, even though he or she might otherwise have been guilty only of murder in the second degree. See Sexton, 2006 VT 55, ¶ 17, 180 Vt. 34, 904 A.2d 1092 (describing mens rea requirements for second-degree murder). In this case, the application of the felony-murder rule to defendant does not require that the State put forth evidence that he murdered the victim; the issue here is whether the State put forth sufficient substantial, admissible evidence to prove beyond a reasonable doubt that Baird had, at minimum, a wanton disregard for human life during the victim's killing. See V.R.Cr.P. 12(d)(2) ; see also Fanger, 164 Vt. at 51-52, 665 A.2d at 37. The other elements the State must prove to convict defendant of first-degree murder are not the subject of the motion to dismiss.
¶ 6. In finding the evidence of intent lacking, the trial court stated "there is no evidence that the defendants intended to harm [the victim] in any way." The court went on to state "there was no evidence from which the jury might reasonably infer that [ ] Defendant knew of the probability or likelihood that his conduct or the conduct of his co-defendants would naturally cause death or great bodily harm to [the victim]." We disagree.
¶ 7. The State's evidence, taken in the light most favorable to it, shows that on the afternoon of September 10, 2010, Richard Fletcher, defendant-Fletcher's half-brother-and Fletcher's cousin, Michael *497 Norrie, met at a vacant property near the victim's house to get high on methamphetamine and devise a plan to commit a burglary. The initial idea to commit a burglary was defendant's. All three codefendants had consumed drugs that day and they consumed more drugs while formulating their plan.
¶ 8. The three men were acquaintances of the victim and had worked for her in the past, and knowing that she kept a key to her front door under the doormat on the porch, the men devised a plan to burglarize her house. Plans concerning what was to happen during the commission of the burglary were unclear other than that the men would search for money and pills, which they believed they would find because they knew the victim was elderly. They expected her to be home and originally intended to wait until 12:20-1:30 a.m. before breaking in so that she would be asleep when they entered. The plan was for Norrie and defendant to enter through the front door using the key that they knew the victim kept under the doormat. Fletcher was to "take" the back door.
¶ 9. Defendant raised the idea of bringing guns to the burglary and the others agreed. According to Fletcher, the plan was for the guns to be unloaded, except for the one he was bringing, and no one was to get hurt. Fletcher told his two coconspirators that their guns should be unloaded because they were more impaired by the drugs they had consumed than he was, but he assumed the guns were unloaded and did not check them. After devising this plan, the three men went to their respective homes to retrieve guns and other things they felt they needed during the burglary. Norrie and defendant got .22 caliber handguns and Fletcher got ammunition for the shotgun that he carried in his truck. Fletcher also got gloves and a mask, and Norrie and defendant got gloves but did not bring masks with which to cover their faces. The three men met back at the vacant property and "got high again."
¶ 10. According to Fletcher, defendant and Norrie were impatient and decided to enter the victim's house at about midnight, half an hour earlier than they had planned. Using the victim's key, Norrie and defendant entered the front door armed with handguns and wearing gloves but without masks to conceal their identities. Fletcher went toward the back door. He was wearing gloves and a mask. As he approached the rear of the house, Fletcher saw that the victim was still awake and was watching television, but it was too late for him to alert the others because defendant and Norrie had already entered the house. Norrie and defendant entered the house through the front door, and defendant then let Fletcher into the house through the rear door. Fletcher did not bring his shotgun into the house. Upon entering the kitchen, Fletcher saw that Norrie had the victim on her knees in front of him and that he had a handgun pointed at the back of her head. While they were all in the kitchen, the three men agreed to search the home.
¶ 11. Norrie remained in the kitchen guarding the victim while defendant went upstairs to search and Fletcher searched downstairs rooms. During his search, Fletcher heard the victim say something to the effect of "take what you want and get out." About a minute later, Fletcher heard a gunshot followed about ten or twenty seconds later by a second gunshot. Defendant was still upstairs when Fletcher heard the gunshots. Fletcher returned to the kitchen and saw the victim lying face down on the floor with a wound to the back of her head. Norrie was standing over her with his handgun still smoking.
*498 The victim appeared to Fletcher to be dead.
¶ 12. Fletcher stated that he was upset with Norrie for killing the victim and that he retrieved his shotgun from outside and got into a struggle with Norrie, resulting in the shotgun discharging into the kitchen ceiling. Defendant got Fletcher to give him the shotgun and no further shots were discharged. Following this dispute, the three then cleaned up the crime scene. Fletcher and defendant later hid the victim's body at a location in Wheelock where it was eventually found.
¶ 13. The question that was before the trial court and that is before this Court on appeal is whether, on the basis of those facts, a reasonable factfinder could conclude that defendant had at least the mental state of wantonness. See Fanger, 164 Vt. at 51-52, 665 A.2d at 37. Wantonness is defined as "extremely reckless conduct that disregards the probable consequences of taking human life." State v. Shabazz, 169 Vt. 448, 455, 739 A.2d 666, 670 (1999). To be convicted of second-degree murder based upon wanton conduct, there must be evidence that the defendant was aware of the deadly risk posed to human life from his or her actions. See State v. Brunell, 159 Vt. 1, 7-8, 615 A.2d 127, 130-31 (1992). However, the State need not prove a defendant's mental state directly because we have long recognized that direct evidence of intent is rare; "it must be inferred from a person's acts and proved by circumstantial evidence." See State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988).
¶ 14. Here, it is undisputed that defendant and Norrie brought not one but two guns into the victim's house during the robbery, and Fletcher left another, admittedly loaded gun, outside. Defendant and Norrie specifically went home to retrieve their handguns after formulating the burglary plan. We have recognized that, as a matter of law, a gun used in a robbery, whether loaded or not, is a dangerous weapon because "[i]t is the potentiality of its use to effectuate the implied threat of injury or death that makes any weapon dangerous." State v. Parker, 139 Vt. 179, 183, 423 A.2d 851, 853 (1980).
¶ 15. Even if we were to accept the argument that defendant did not know that his codefendants' guns were loaded, that claim is insufficient, in the context of a Rule 12(d) motion, to negate a finding of wantonness. The very purpose of being armed, and of brandishing weapons, is to convey to the intended victim the belief that the guns are loaded and that serious and potentially deadly harm will result unless the victim complies. The victim has no way to know whether any weapon is loaded but certainly must believe that it is, consistent with the representation being made by the perpetrator. The introduction of weapons during the commission of a crime is a significant escalation of dangerousness, even if some or all the perpetrators believe the guns are unloaded. The only purpose in bringing a firearm to the commission of a robbery is to use it or to threaten to use it. Such an escalation increases the danger to human life. Commonwealth v. Carter, 396 Mass. 234, 484 N.E.2d 1340, 1342 (1985). As the Carter court noted, "[t]he use of a gun, even if it is unloaded, may provoke violent resistance from the intended victim" or result in other deadly consequences. Id. Many people have weapons in their homes and could easily respond violently to the threat posed by an armed burglary. In addition, a gun that one coconspirator believes to be unloaded may in fact be loaded-regardless of the coconspirators' expectations-as was the case here. Such a gun may come to cause death, as it did to the victim here. Also, a gun may be used as a bludgeon *499 even if it is not loaded. See Parker, 139 Vt. at 183, 423 A.2d at 853.
¶ 16. Here, moreover, the admissible statements from Fletcher's deposition, taken in the light most favorable to the State, show that all three men knew that Fletcher was bringing ammunition for his shotgun to the burglary. There was no need to have any ammunition if the only purpose was to scare the victim. The decision to bring ammunition for at least one of the guns, as all three men knew to be the case, was to provide the ability to use the gun if necessary. Further, that all three men brought guns with them after their significant drug use heightened the probability of injury or death. The use of one or more guns in the commission of the burglary, loaded or not, is sufficient evidence to survive a Rule 12(d) motion to dismiss on the issue of defendant's mental state.
¶ 17. Contrary to the dissent's assertions, evidence of defendant's wantonness is not confined to the decision to use firearms in the commission of a burglary. Defendant and his coconspirators knew the victim to be elderly and targeted her home with that in mind. After entering her home and while Norrie had the victim on the floor in an execution position, the three men agreed to search her home. Defendant, who was then with the other two men, was or should have been aware of the peril facing the victim. Since they all knew each other, and since he and Norrie were not wearing masks, defendant was also aware that the victim had an opportunity to recognize him and Norrie. Despite this life-threatening situation, defendant did nothing to de-escalate the risk of harm to the victim and instead left the room to ransack the second floor of the house, leaving the victim on her knees at gunpoint.
¶ 18. Additionally, all three men were aware that the victim knew them and could identify them if she saw them. Significantly, they expected that she would be home the night of the burglary, which was why they initially intended to delay entry until she would likely be asleep. Despite their awareness that the victim could identify them, and knowing that she was home, defendant and Norrie wore nothing to conceal their identity, risking the chance of identification. That the three men entered the home through two different doors, coupled with Fletcher's statement that he would "take" the back door, could also be viewed as a way to prevent the victim from successfully fleeing as might be the case if entry was made by all three burglars through the front door. These additional facts further contribute to the wantonness of defendant's actions. The evidence of wantonness was sufficient for the question of defendant's mental state to survive a Rule 12(d) motion to dismiss. Because the State produced sufficient evidence that fairly and reasonably tended to show the defendant guilty beyond a reasonable doubt, see State v. Free, 170 Vt. 605, 605-06, 749 A.2d 622, 623 (2000) (mem.), the motion to dismiss should have been denied.
The dismissal of the murder charge is reversed, the charge is reinstated and the case remanded for further proceedings.

The enumerated felonies are "perpetrating or attempting to perpetrate arson, sexual assault, aggravated sexual assault, robbery[, and] burglary." 13 V.S.A. § 2301.