ROBINSON, J., dissenting.
¶ 38. Although I am sympathetic to the goal of narrowing a criminal statute to avoid constitutional infirmity, I believe the majority's construction of the term "threatening behavior" is excessively narrow because it precludes prosecution for a serious expression of an intent to commit acts of unlawful violence to a particular individual or group of individuals uttered in public with an intent to cause public inconvenience or annoyance if that threat is unaccompanied by a physical gesture. I would construe the definition of "threatening behavior" in the statute to reach a communication of an intent to inflict physical or other harm-even that which takes the form of threatening words unaccompanied by a physical motion beyond the act of speaking-to the extent that in its overall context such threatening behavior, including its expressive component, is not constitutionally protected. Our standard of review at this stage of the proceedings is significant. The question for us on appeal is not how this Court construes the evidence but whether a reasonable jury could find defendant guilty if it viewed the record evidence, and the inferences from that evidence, in the light most favorable to the State. Given the combination of three critical factors-that the communications in this case were targeted exclusively at two minority residents in a predominantly white, nonhispanic neighborhood, they invoked powerful symbols of violence against racial and ethnic minorities, and they were placed inside or next to the screen doors of two targeted individuals' homes-a reasonable and properly instructed jury could conclude that the threats in this case were not constitutionally protected. Accordingly, I would affirm.
I. In Some Contexts Stated Threats Can Constitute "Threatening Behavior" Under 13 V.S.A § 1026(a) Consistent with the Legislature's Intent and the First Amendment
¶ 39. The majority's conclusion that the "threatening behavior" prong of the disorderly conduct statute reaches only physical actions,[9] and that any accompanying words *835 are relevant only insofar as they provide insight as to the meaning of the physical actions, is not supported by our own prior caselaw, the plain language of the statute, the statutory scheme more broadly, the Legislature's intent, or the constitutional imperative driving the majority's construction.
¶ 40. In prior cases, our focus in assessing threatening behavior has not been the presence or absence of a physical component but the presence or absence of a " 'communicated intent to inflict physical or other harm.' " State v. Sanville, 2011 VT 34, ¶ 9, 189 Vt. 626, 22 A.3d 450 (mem.) (quoting State v. Ashley, 161 Vt. 65, 72, 632 A.2d 1368, 1372 (1993) ); see State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988) (describing "[t]hreatening behavior" as "behavior that communicates the requisite intent" to "inflict harm on person or property"). We have considered conduct's "physical component" in assessing whether the conduct was threatening, and frequently we have found physical actions to communicate threatening intent.
¶ 41. For example, in State v. Albarelli, we considered a disorderly conduct charge against a defendant who had engaged in a loud, agitated, and prolonged rant on a public pedestrian way by a table where individuals were promoting the presidential campaign of then-candidate Barack Obama. 2011 VT 24, ¶¶ 2-6, 189 Vt. 293, 19 A.3d 130. We concluded that the evidence was insufficient to support a conviction for "threatening behavior" because the behavior did not convey an intent to do harm to another person. Id. ¶ 18. We recognized that "[l]anguage may be treated as a threat to harm a victim, even in the absence of an explicit statement to do so, as long as circumstances support the victim's fearful or apprehensive response" from the perspective of a reasonable person. Id. ¶ 20 (quotation omitted). We identified factors to consider in determining whether a defendant has engaged in "threatening behavior," including whether the defendant made targeted threats to a specific person or made threatening physical gestures. Id. ¶ 21. Noting that the defendant in that case had not made any explicit threats to harm any other person, his conduct was not directed at any person in particular, and his conduct lacked any "physical component" beyond gesticulating, this Court concluded that the evidence did not support the charge that he had engaged in threatening behavior. Id. ¶¶ 22-25. Although we considered the presence or absence of physical gestures as a factor in determining whether defendant engaged in "threatening behavior," we recognized that the critical consideration was the effect of defendant's behavior on a reasonable listener. Physical gestures are undoubtedly relevant to a reasonable assessment of the situation, but we have never said that the *836 physical component, or its absence, is dispositive. Rather, we have focused on the overall context-including the words spoken, the context in which they were spoken, and any accompanying physical actions-to assess the threat.[10]
¶ 42. To the extent that they are relevant, our probation condition cases reinforce this conclusion.[11] In State v. Johnstone, we noted that there was "no allegation that defendant knew that the target of his statements was within earshot" and concluded, without any discussion of the presence or absence of a physical component, that facts did not indicate "defendant intended to put his probation officer in fear of harm or to convey a message of actual intent to harm her." 2013 VT 57, ¶¶ 17-18, 194 Vt. 230, 75 A.3d 642. In State v. Sanville, we recognized that this Court had not yet decided whether verbal threats can constitute threatening behavior in the context of probation conditions. 2011 VT 34, ¶ 7, 189 Vt. 626, 22 A.3d 450. However, we did not then decide the issue, and, as noted above, we applied a standard that defined "threat" as a "communicated intent to inflict physical or other harm" and "threatening behavior" as "behavior that communicates the requisite intent." Id. ¶ 9 (concluding that probationer did not have sufficient notice that his heated arguments, in which he "mouthed off" inappropriately, would be deemed to be violent and threatening behavior).[12] Likewise, in State v. Miles, we declined to reach the question because the defendant in that case was being held in the mental health unit of a state correctional facility, made statements that suggested that he was delusional, and threatened to kill someone who may or may not have actually been a real person. 2011 VT 6, ¶ 8, 189 Vt. 564, 15 A.3d 596.
¶ 43. Our decisions have been faithful to the plain language of the statute. The everyday meaning of "threatening behavior" includes making serious threats to cause imminent bodily harm. Common usage supports the understanding that "threatening behavior" includes standing in the middle of a crowded pedestrian way and asserting loudly and repeatedly, to nobody in particular but in a way that reasonably gives rise to fear of bodily harm, that you will detonate a pipe bomb if people don't stop and listen. See State v. Therrien, 2011 VT 120, ¶ 9, 191 Vt. 24, 38 A.3d 1129 ("When interpreting a statute our goal is to give effect to the intent of the Legislature, and to do so we first look at the plain, ordinary meaning of the statute." (quotation omitted) ). In construing the statute, we ought not lose sight of this common sense understanding. At most, the Legislature's *837 use of the term "threatening behavior" is ambiguous; it is by no means clear that it is limited to physical actions that convey a threat, as opposed to the expression of words that do the same. It may well be intended to expand the reach of the statute by including threats that are inferred from actions rather than exclusively threats that are communicated through words.
¶ 44. On balance, the statutory scheme likewise supports the view that "threatening behavior" can describe communicated threats unaccompanied by physical gestures, although I acknowledge that it's a mixed bag. On the one hand, the Legislature has expressly prohibited threats in several statutes without describing the offense as "threatening behavior." See, e.g., 13 V.S.A. § 1027(a) (prohibiting disturbing the peace by electronic communications including threats "to inflict injury or physical harm to the person or property" of another with intent to "terrify, intimidate, threaten, harass, or annoy); ibr.US_Case_Law.Schema.Case_Body:v1">id. § 1702(a) (prohibiting criminal threatening, defined as knowingly threatening another person and "plac[ing] [that] person in reasonable apprehension of death or serious bodily injury"); id. § 1026a(a) (prohibiting aggravated disorderly conduct offense including both "threatening behavior" and threats of "bodily injury or serious bodily injury" if threats or threatening behavior are undertaken as course of conduct with intent to cause person "inconvenience or annoyance, or to disturb the person's peace, quiet, or right of privacy").[13]
¶ 45. On the other hand, in prohibiting attempts "by physical menace to put another in fear of imminent serious bodily injury" the Legislature has expressly identified a "physical action" requirement when it has sought to address threats conveyed *838 through physical actions. Id. § 1023(a)(3); see also Graham v. State, (¶ 16), 967 So.2d 670, 675 (Miss. Ct. App. 2007) (" 'Physical' menace demands something more than words.") (quotation omitted); Ickes v. Ickes, No. 89-S-520, 1989 WL 223538, at *2 (Pa. Com. Pl.) ("A 'menace' is a threat. A physical menace therefore would be a physical threat as opposed to a verbal threat directed toward a victim." (citation omitted) ).[14]
¶ 46. The reason I conclude that the statutory scheme as a whole supports the view that the disorderly conduct statute reaches some threats that are unaccompanied by physical gestures if made with the intent to cause public inconvenience or annoyance is that a contrary construction would leave a major gap in the statutory scheme. Under the majority's view, as the majority notes, Vermont law does prohibit threats against a specific individual without regard to the presence or absence of physical gestures accompanying the threats. See ante, ¶¶ 26-27. The private interest in freedom from targeted threats may be amply protected by other statutes besides 13 V.S.A. § 1026. See 13 V.S.A. §§ 1026a, 1027, 1702. In fact, these other statutory provisions are arguably far better suited than § 1026 to address defendant's alleged conduct in this case. But in the context of threats to the public generally, communicated in words with the requisite intent to cause the kinds of public disruptions targeted by the disorderly conduct statute, the majority's construction leaves the State with no tools for regulating, say, the hypothetical shouted threat to detonate an explosive in the middle of a crowded pedestrian mall.[15] I find it hard to believe that the Legislature has so comprehensively regulated private threats, and has broadly proscribed public nuisances, but intended to exempt from prosecution all generalized public threats unaccompanied by physical gestures, without regard to the seriousness of the threat, the context in which it is communicated, or the intended public disruption underlying the threat.
¶ 47. The legislative intent underlying § 1026 supports this view. As we have previously noted, § 1026 is really a "criminal public nuisance statute." State v. Cole, 150 Vt. at 455-56, 554 A.2d at 255. The statute is based, to a large extent, on the Model Penal Code § 250.2. We have recognized that "[w]hen our statute is taken from a model act, it is often helpful to examine the intent behind the model act." State v. Papazoni, 159 Vt. 578, 581, 622 A.2d 501, 503 (1993). The focus of the Model Penal Code disorderly conduct provision is "those who are consciously indifferent to the public peace and tranquility," which is the ultimate target of the provision. Model Penal Code § 250.2 Commentaries (Am. Law Inst., Official Draft and Revised Comments 1980). With respect to the prohibition of threatening in the Model *839 Penal Code, the official commentary explains:
Because the concept of threatening is not otherwise defined, this aspect of the offense reaches any kind of threat, whether verbal or physical, that creates risk of public inconvenience, annoyance, or alarm. This coverage is broader than [the section of the Model Code that] proscribes as a form of assault attempting "by physical menace to put another in fear of imminent serious bodily injury." The disorderly conduct provision contains no such limitation on the kinds of threats covered, but that breadth is balanced by the requirement of purpose or recklessness with respect to creation of a public nuisance. Again, the differences between disorderly conduct and assault reflect the different rationales of the two offenses and the distinct harms at which they are aimed.
Id. cmt. 3 at 331.
¶ 48. There can be no doubt that the Model Penal Code, upon which our disorderly conduct statute is based, reaches public disruption arising from threatening words. To the extent that a threat of harm, whether communicated through words, gestures, or both, can be quite disruptive to public order, it falls squarely within the universe of harms the Vermont Legislature intended to address with the disorderly conduct prohibition.[16]
¶ 49. By contrast, the majority's approach-focusing on the presence or absence of physical movement-hones in on the wrong factor. The public harm from threatening behavior does not arise from a defendant's gesticulating while engaging in a threatening tirade; it flows from the threatening tirade itself. Excluding from the statute's reach those public threats that are communicated in words without the accompanying gesticulation would frustrate the purpose of the statute.
¶ 50. Most important, I believe the majority's approach to narrowing the statute is both overinclusive and underinclusive relative to the constitutional considerations that motivate the majority to narrow the statute in the first place. Even though the majority's interpretation is at odds with our caselaw and the statutory language, scheme, and purpose for the reasons set forth above, I might join in the majority's attempt to narrow the scope of the statute *840 if its construction made sense as a way of avoiding conflict with the First Amendment. But by narrowing the statute based on a factor that has little to do with the underlying purposes of the statute or the relevant constitutional considerations, the majority has defined out of the statute's reach much behavior that can constitutionally be prohibited, and that the Legislature intended to include, while simultaneously leaving considerable room for constitutional conflict in cases in which a threat is conveyed through expression other than words.
¶ 51. The U.S. Supreme Court has long recognized that some threatening speech may be prohibited without offense to the First Amendment. In Watts v. United States, the Court upheld a constitutional challenge to a statute prohibiting threats against the life of the President of the United States. 394 U.S. 705, 706, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Consistent with "the commands of the First Amendment," the Court explained that in applying the statute a court must distinguish a threat from constitutionally protected speech. Id. It concluded that a protester's conditional statement that if he was drafted to serve in the war he would shoot the President was, in context, political hyperbole and not a true threat.
¶ 52. More recently, in Virginia v. Black, the Court reaffirmed that among the categories of expression states may regulate consistent with the Constitution are "true threats," defined to "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (plurality opinion). The Court explained that a speaker "need not actually intend to carry out the threat," because the prohibition on true threats "protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." Id. at 360, 123 S.Ct. 1536 (quotations and alteration omitted). Considering a statute proscribing intimidation through cross burning, the Court said, "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." Id. The Court declined to strike down the statute insofar as it prohibited cross burning with the intent to intimidate, although it did strike down convictions under the statute on account of a provision in the statute that the fact of cross burning alone is facial evidence of an intent to intimidate.
¶ 53. State and federal courts have relied on this test in construing statutes that criminalize threats, and in evaluating their constitutionality. See, e.g., United States v. Turner, 720 F.3d 411, 421 (2d Cir. 2013) (affirming defendant's conviction for threatening judges online where evidence was sufficient to show that his statements were not "political hyperbole," but violent threats against the judges lives); United States v. Parr, 545 F.3d 491, 493 (7th Cir. 2008) (affirming defendant's conviction for threatening to blow up federal building where he described his plans in great detail and had history of building bombs and supporting terrorism); In re Robert T., 2008 WI App 22, ¶¶ 18-19, 307 Wis.2d 488, 746 N.W.2d 564 (evaluating statute prohibiting bomb scares, holding that "true threats" are not limited to those directed at specific person or group of people and threatening bodily harm or death); State v. DeLoreto, 265 Conn. 145, 827 A.2d 671, 679, 686 (2003) (concluding that in context, defendant's threats to "kick your punk ass" to two different police officers constituted *841 true threats subject to prosecution under statute prohibiting breach of peace).
¶ 54. The majority's holding precludes prosecution under the disorderly conduct statute for a large swath of true threats that the Legislature can permissibly prohibit consistent with the First Amendment and which, as argued above, the Legislature intended to proscribe. In particular, the majority removes from the disorderly conduct statute true threats communicated without an accompanying physical gesture, even if the other elements of the disorderly conduct statute are satisfied. Its construction of the statute is far narrower than required by the First Amendment, to the detriment of the State's ability to regulate public disturbances occasioned by true threats.
¶ 55. At the same time, the majority's holding does little to address the serious constitutional questions that may arise even when a threat is communicated through physical gestures alone, or in combination with words. What makes a threat threatening-whether it is communicated through words, physical actions, or some combination of the two-is the substance and credibility of the communication itself. Even if the State could only prosecute gestures or physical acts as "threatening behavior," it's the expressive content of the gestures or acts that make them threats. See, e.g., Cole, 150 Vt. at 457, 554 A.2d at 255 (noting that defendant's "act of grabbing the flashlight could be found to be threatening behavior, done to communicate the intent to harm"). Prosecuting someone who delivers a Ku Klux Klan recruitment flyer with a threatening gesture raises First Amendment concerns, notwithstanding the physical action accompanying the written communication. Ultimately, what matters-both from the perspective of the goals of the statute and from the perspective of the First Amendment-is what is communicated by the gesture, words, or combination thereof-and whether that communication falls within or outside of the protection of the First Amendment. A raised fist can communicate a threat, but may also act as symbolic speech. Although the majority succeeds in avoiding these constitutional questions in this case, its analysis makes them no less inevitable.
¶ 56. In sum, the focus of the disorderly conduct statute is not the physical movements that convey or accompany the communication of threats; it's the threats themselves. And the exception to the U.S. Constitution's protection of free speech is based on the meaning and significance of the threats themselves, not the manner in which they are communicated. The factor relied upon by the majority to limit the scope of § 1026 accomplishes the goal, in this case, of avoiding difficult constitutional questions, but does so by relying on a factor that has little to do with anything. For these reasons, I cannot join the majority's construction of § 1026.
II. "Threatening Behavior" Encompasses "True Threats"
¶ 57. To narrow the statute against a facial challenge, I would construe the "threatening behavior" prong of the disorderly conduct statute consistent with our prior decisions as well as with the limitations of the First Amendment, as we have done in connection with the "abusive language" prong of that statute. This construction incorporates ample safeguards for free speech insofar as it requires, in addition to a "true threat" in the constitutional sense, (1) an intent to threaten; (2) an objective threat; and (3) a finding of intent, or at least recklessness, with respect to the public disruption engendered by the threatening behavior.
¶ 58. In construing another provision of the disorderly conduct statute that raises *842 First Amendment concerns, we have narrowed the reach of that provision to include the activity the Legislature sought to regulate, but only to the extent permitted under the U.S. Constitution. In State v. Read, we considered a facial challenge under the First Amendment to the prong of the disorderly conduct statute addressing "abusive language." 165 Vt. 141, 680 A.2d 944 (1996). We noted the longstanding " 'tenet of First Amendment law that in determining a facial challenge to a statute, if it be "readily susceptible" to a narrowing construction that would make it constitutional, it will be upheld.' " Id. at 146, 680 A.2d at 947 (quoting Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) ). And we emphasized our obligation "to narrow and limit the statute in light of the protections guaranteed by the United States and Vermont constitutions." Id.; see also State v. Cantrell, 151 Vt. 130, 134, 558 A.2d 639, 642 (1989) ("Where possible, a statute must be construed to avoid constitutional infirmities."). Accordingly, in Read, we held that the "abusive language" prong of the disorderly conduct statute could only reach abusive language that falls outside the protection of the First Amendment-namely, "fighting words." 165 Vt. at 148, 680 A.2d at 948. More recently, in State v. Tracy, we reaffirmed this approach to construction of the statute, emphasizing that in modern times, speech that would meet the constitutional test for "fighting words" is rare, if it exists at all. 2015 VT 111, ¶¶ 35-38, 200 Vt. 216, 130 A.3d 196. I would take the same approach to the "threatening behavior" prong of the disorderly conduct statute and limit its reach to threatening behavior that may be proscribed under the First Amendment-including speech that constitutes a "true threat" under the caselaw set forth above.
¶ 59. While this construction is broader than the majority's construction, at least with regard to the scope of verbal threats subject to regulation under the statute, its scope is subject to three important limitations that mitigate the free speech concerns that it raises.
¶ 60. First, whatever state of mind is required relative to the risk of public annoyance or inconvenience, the speaker of a "true threat" under our disorderly conduct statute must intend to threaten. We recognized in Cole that the word "threaten" includes "some element of volition," namely, "a communicated intent to inflict harm on person or property." 150 Vt. at 456, 554 A.2d at 255. Accordingly, although courts are divided as to whether the constitutional test for "true threats" is an objective standard from the perspective of the speaker, we have already recognized that under our disorderly conduct statute the speaker must intend to threaten. Compare In re RobertT., 2008 WI App 22, ¶ 11, 307 Wis.2d 488, 746 N.W.2d 564 (explaining test for true threats "is an objective standard from the perspectives of both the speaker and listener") (quotation omitted), with United States v. Cassel, 408 F.3d 622, 631 (9th Cir. 2005) (concluding that in Black, U.S. Supreme Court established "intent to threaten" as essential to "constitutionally punishable threat"); see also Parr, 545 F.3d at 499-500 (noting federal appellate courts are divided on question of whether true threat requires subjective intent on part of threatener).
¶ 61. Second, whether the content of the threatening communication, taking into account the full context, rises to the level of a true threat is evaluated from the objective perspective of a reasonable, similarly situated person, and is not based on the particular response of a recipient of the threat. See State v. Gagne, 2016 VT 68, ¶ 23, 202 Vt. 255, 148 A.3d 986 ("[W]hether conduct amounts to a threat is generally discerned from the perspective of a reasonable *843 person under similar circumstances."); see also United States v. Bagdasarian, 652 F.3d 1113, 1118-23 (9th Cir. 2011) (explaining that analysis of threats includes both subjective and objective considerations: whether reasonable person hearing statement would understand it as serious expression of intention to inflict bodily harm, and whether defendant had subjective intent to communicate threat); Brewington v. State, 7 N.E.3d 946, 963, 969 (Ind. 2014) (considering both whether speaker subjectively intends threat to place victim in fear of bodily harm or death, and whether reasonable person, similarly situated to victims, would fear for their safety or that of someone close to them on account of threat).
¶ 62. Finally, in addition to the intent to convey a threat, the speaker must also intend to cause public inconvenience or annoyance, or recklessly create such a risk. This requirement keeps the ultimate focus of the disorderly conduct statute aligned with its purpose: to protect against public disturbances more generally. See supra, ¶¶ 46-48.
¶ 63. The disorderly conduct statute requires reckless or intentional creation of a public inconvenience or annoyance. We have on several occasions addressed the "public annoyance" requirement. In State v. Lund, we upheld the disorderly conduct conviction of a defendant who yelled at a sheriff and attempted to bite the sheriff's hand at the sheriff's office and local jail. 144 Vt. 171, 173-74, 475 A.2d 1055, 1057-58 (1984), overruled on other grounds by State v. Begins, 148 Vt. 186, 531 A.2d 595 (1987). In response to the defendant's argument that the statute did not apply because members of the public were not present, we explained, "[p]ublic is defined as a place open to common or general use." Id. at 179, 475 A.2d at 1060-61 (quotation omitted). Because the sheriff's office fell within this definition, the statute applied. We reiterated this analysis in Cole, concluding that defendant's act of grabbing a flashlight from a law enforcement officer alongside a public highway was sufficiently public because a public roadway "is clearly open to general and common use." 150 Vt. at 456, 554 A.2d at 255. "Public" is not defined in Vermont's disorderly conduct statute, but is defined in the Model Penal Code section upon which our statute is based as "affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood." Model Penal Code § 250.2(1)(c). Public disturbances may occur "in such privately owned facilities as stores, apartment houses, and theaters, but the Model Code does not follow prior statutes making it criminal to disturb the "peace and quiet of any person." Id. cmt. 2, at 329. The model code does not authorize police intrusion into the home or place of business to control private misbehavior.[17]
*844 ¶ 64. These three factors, in addition to the requirement that the threats themselves meet the constitutional standard for "true threats" further limit the scope of the "threatening behavior" prong of the disorderly conduct statute.
III. A Reasonable Jury Could Conclude That Defendant's Communications In This Case Are True Threats
¶ 65. A reasonable jury could conclude that defendant's communications amount to "threatening behavior" and constitutionally unprotected true threats because, taking the evidence in the light most favorable to the State and considering the context of the flyers as well as their actual language, the jury could conclude that defendant intended to threaten the victims, and that a reasonable person in the victims' circumstances would understand defendant's communications as an actual threat. The singling out of these particular minority victims for receipt of the flyers, the history of the Ku Klux Klan and the imagery of hooded Klansmen and burning crosses, and the anonymous and intrusive placement of the flyers in the doors of the victims' homes are three critical factors that, in combination, support this conclusion.
¶ 66. The question for us on appeal is not whether, as a matter of law, defendants engaged in threatening behavior that communicated a constitutionally unprotected true threat, and is not how the Court construes the evidence, but, rather, is whether a properly instructed reasonable jury could find defendant guilty. We will affirm the trial court's denial of the defendant's motion to dismiss if the State's evidence "fairly and reasonably tend[ed] to show the defendant guilty beyond a reasonable doubt when we view the evidence in the light most favorable to the State and exclude modifying evidence." Cole, 150 Vt. at 455, 554 A.2d at 254-55 (quotation omitted). This threshold is high: "Because the grant of a motion to dismiss precludes a jury from hearing any evidence and because a jury is in the best position to weigh facts and deliver a verdict, courts should grant a [motion to dismiss] only when there is no evidence to support a guilty verdict." State v. Baird, 2017 VT 78, ¶ 2, --- Vt. ----, 175 A.3d 493 (quotation omitted).
¶ 67. Moreover, we consider whether a reasonable jury could conclude that defendant's communications amount to "true threats," not whether this Court itself reaches that conclusion. See United States v. Stevens, 881 F.3d 1249, 1252 (10th Cir. 2018) ("Whether a reasonable jury could find [defendant's] statements to be true threats is a question of law. If there is no question that a defendant's speech is protected by the First Amendment, the court may dismiss the charge as a matter of law. But, absent an unusual set of facts, the question whether statements amount to true threats is a question generally best left to a jury." (citation, quotations, and *845 alteration omitted) ); Turner, 720 F.3d at 419 (noting that most cases involving threats are within broad expanse of varying fact patterns which may not be resolved as matter of law, and indicating that court should affirm conviction for threats "if the evidence at trial was sufficient to permit a reasonable jury to find that [defendant's] conduct constituted a threat" (quotation omitted) ); Fogel v. Collins, 531 F.3d 824, 829 (9th Cir. 2008) ("Deciding whether political speech is protected political hyperbole or an unprotected true threat can be an issue for a jury, particularly in cases of criminal prosecution.").
¶ 68. In reviewing defendant's appeal based on the trial court's denial of his motion to dismiss, we view the State's evidence in the light most favorable to the State, and excluding any modifying evidence. State v. Elkins, 155 Vt. 9, 17-18, 580 A.2d 1200, 1204 (1990). That means, for example, that we discount the evidence that defendant distributed the offending flyers broadly, and accept as fact that he delivered them only to the two individuals identified in the complaint. As the trial court noted, defendant left one flyer between one victim's screen door and her inner door. In order to do that, defendant had to "ascend a set of stairs, walk across her porch, and open the screen door." Defendant left the other flyer in the victim's mailbox, which also required defendant to walk directly to the second victim's front door. Further, we must draw the most prosecution-friendly inferences concerning the defendant's intent that the evidence can support.
¶ 69. The critical question in this case is whether a reasonable person in the position of the target of defendant's threats would understand that an actual threat had been made. Stevens, 881 F.3d at 1253. The specific language of a communication and the context in which the statements are made are both relevant. Id.; see also United States v. Dillard, 795 F.3d 1191, 1201 (10th Cir. 2015) (explaining statement is true threat if "reasonable recipient could conclude, based on the language of the communication and the context in which it is delivered, that this was in fact a veiled threat of violence by the defendant").
¶ 70. The fact that a communication does not expressly articulate a threat of violence or harm, while relevant, is not dispositive in the "true threats" analysis. We have recognized that "[l]anguage may be treated as a threat to harm a victim, even in the absence of an explicit statement to do so, as long as circumstances support the victim's fearful or apprehensive response." Albarelli, 2011 VT 24, ¶ 20, 189 Vt. 293, 19 A.3d 130 (quotation omitted). Courts should avoid "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience" as ingenious threateners "can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." Turner, 720 F.3d at 422 (quotation omitted) (holding that public statements that judges should be killed, describing murder of another judge's family, and posting judges' photos and work addresses amounted to true threats); see also Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. Of Life Activists, 290 F.3d 1058, 1075 (9th Cir. 2002) (en banc) ("The fact that a threat is subtle does not make it less of a threat." (quotation omitted) ).
¶ 71. Moreover, the context of a communication, both immediate and historical, is highly relevant to understanding whether it amounts to a threat. "[C]ontext is critical in a true threats case and history can give meaning to the medium." Planned Parenthood of Columbia/Willamette, Inc., 290 F.3d at 1078. "[W]ithout context, a burning *846 cross or dead rat mean nothing." Id. at 1079. For example, where an anti-abortion defendant was aware that a "GUILTY" poster would likely be interpreted by a doctor in the reproductive health services community who was identified on one as a serious threat of death or bodily harm, given the previous pattern of "WANTED" posters identifying a specific physician followed by the physician's murder, the poster was "true threat." Id. at 1063, 1079. Similarly, in United States v. Hart, the Eighth Circuit concluded that a defendant's parking Ryder trucks in the driveways of a reproductive health clinic could be construed as a threat to intimidate the clinic in the context of, among other factors, ongoing protests and violence against such clinics and the similarity of the defendant's actions to the well-known events of the Oklahoma City bombing. 212 F.3d 1067, 1072 (8th Cir. 2000).[18]
¶ 72. A threat need not suggest "imminent" harm to lose its constitutional protection. See, e.g., Parr, 545 F.3d at 497 ("A threat doesn't need to ... specify when it will be carried out."); DeLoreto, 827 A.2d at 682 ("[T]he threat need not be imminent to constitute a constitutionally punishable true threat."); People v. Lowery, 52 Cal.4th 419, 128 Cal.Rptr.3d 648, 257 P.3d 72, 78 (2011) (rejecting contention that statute violates First Amendment because it lacks any requirement that threat to harm crime victim or witness is to be carried out immediately, or that defendant have apparent ability to carry it out). But see United States v. Fullmer, 584 F.3d 132, 154 (3d Cir. 2009) ("[W]hile advocating violence that is not imminent and unlikely to occur is protected, speech that constitutes a 'true threat' is not.").
¶ 73. Applying these standards, although I believe this is a close case, I conclude that a reasonable jury, drawing permissible inferences from the evidence most favorable to the State, could conclude that defendant's communications amount to true threats. I rely primarily on three closely related considerations.
¶ 74. First and foremost, the jury could infer that these communications were specifically directed at two individuals, one identified as African American and one identified as Mexican, in a predominantly white, nonhispanic neighborhood. This factor is critical. If this was, in fact, a general recruitment solicitation for the Ku Klux Klan, as suggested by the majority, ante, ¶ 34, the State would lose. A communication merely urging people to join an organization, even a heinous one with unlawful or violent goals, is not a true threat. See Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). But, as noted above, a jury must consider the facial language of the communication in its actual context.
*847 ¶ 75. The evidence viewed in the light most favorable to the State is that defendant acknowledged that he would usually choose "white" neighborhoods for distributing such flyers, and that the only two people to whom he actually delivered the flyers are members of ethnic or racial minorities. Given that members of racial and ethnic minorities are not typically considered prime recruits for the Ku Klux Klan, a reasonable jury could conclude that defendant's targeted communications to a black person and a Mexican person were not intended to communicate a message of recruitment and would be reasonably understood to convey a different message-albeit veiled. Moreover, the fact that the communications were targeted at the two victims bolsters the argument that the communications were threats directed at them in particular, rather than general political advocacy of a menacing message. See Fogel, 531 F.3d at 830 (explaining that whether speech is directed at specific individuals is relevant to whether speech can reasonably be characterized as protected political rhetoric or hyperbole).
¶ 76. Second, the historical and modern-day association of hooded Klan members carrying burning crosses with intimidation of and violence against racial and ethnic minorities and their perceived allies is deeply ingrained in our nation's DNA. In Virginia v. Black, the U.S. Supreme Court traced the history of the Ku Klux Klan and its use of cross burning as a tool of intimidation. 538 U.S. at 352-57, 123 S.Ct. 1536 (plurality opinion). The Court explained that a 1905 book portrayed the by-then-defunct Klan from the post-Civil War Reconstruction period as heroes, and depicted the Klan as burning crosses to celebrate the execution of former slaves. Id. at 353, 123 S.Ct. 1536. This publication, and the 1915 movie it inspired-The Birth of a Nation-launched the second genesis of the Klan. Id. at 353-54, 123 S.Ct. 1536. A poster advertising the film "displayed a hooded Klansman riding a hooded horse, with his left hand holding the reins of the horse and his right hand holding a burning cross above his head." Id. at 354, 123 S.Ct. 1536. From that time on, "the association between cross burning and the Klan became indelible." Id.
¶ 77. The Court traced the activities of the Klan, and its use of cross burning, through the twentieth century, explaining that the Klan often used cross burnings as a tool of intimidation and a threat of impending violence. Id., 123 S.Ct. 1536. It described cross burnings in front of synagogues, proposed housing projects, and union halls, explaining, "[t]hese cross burnings embodied threats to people whom the Klan deemed antithetical to its goals. And these threats had special force given the long history of Klan violence." Id. at 355, 123 S.Ct. 1536. The Court described bombings, beatings, shootings, stabbings, and mutilations in response to the civil rights movement of the 1950s and 1960s, and noted that "[m]embers of the Klan burned crosses on the lawns of those associated with the civil rights movement, assaulted the Freedom Riders, bombed churches, and murdered blacks as well as whites whom the Klan viewed as sympathetic toward the civil rights movement." Id. at 355-56, 123 S.Ct. 1536. The Court recognized that
when a cross burning is directed at a particular person not affiliated with the Klan, the burning cross often serves as a message of intimidation, designed to inspire in the victim a fear of bodily harm. Moreover, the history of violence associated with the Klan shows that the possibility of injury or death is not just hypothetical. The person who burns a cross directed at a particular person often is making a serious threat, meant to coerce the victim to comply with the Klan's *848 wishes unless the victim is willing to risk the wrath of the Klan.
Id. at 357, 123 S.Ct. 1536. The Court concluded that "[t]he First Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation." Id. at 363, 123 S.Ct. 1536. The Court concluded that insofar as the Virginia statute appeared to allow a jury to infer an intent to intimidate from the fact of burning a cross alone, it was facially invalid. Id. at 367, 123 S.Ct. 1536. The Court reversed the conviction of one defendant who had burned a cross at what the Court characterized as a "political rally," and reversed and remanded the other convictions to leave open the possibility that the Virginia statute might be construed on remand in a way that was different from the Court's understanding. Id., 123 S.Ct. 1536.
¶ 78. In his dissent, Justice Thomas wrote, "[i]n every culture, certain things acquire meaning well beyond what outsiders can comprehend. That goes for both the sacred, and the profane. I believe that cross burning is the paradigmatic example of the latter." Id. at 388, 123 S.Ct. 1536 (Thomas, J., dissenting) (citation omitted). Justice Thomas described the Klan as "a terrorist organization, which, in its endeavor to intimidate, or even eliminate those it dislikes, uses the most brutal of methods," and concluded, "[i]n our culture, cross burning has almost invariably meant lawlessness and understandably instills in its victims well-grounded fear of physical violence." Id. at 389-91, 123 S.Ct. 1536.
¶ 79. I recognize that this case does not involve an actual cross burning. That would present a much easier case. But even though we do not today see the breadth and severity of the violence associated with the Klan of a prior era, the legacy of the Klan and the violence it represents is not a dead letter in today's America. The potency of the burning cross symbol, and the organization with which it is so closely associated, shapes the context of the communications in this case. Even a crude drawing of a hooded member of the Klan riding a hooded horse while raising a burning cross, when distributed selectively to two minority individuals in a predominantly white, nonhispanic neighborhood, can reasonably be understood to impart a substantial veiled threat.
¶ 80. Third, a jury could conclude that by placing the flyers anonymously in or next to the front doors of the victims homes, defendant intended to convey a message -"I know who you are and I know where you live"-calculated to arouse fear of violence or harm from an unknown enemy. The trial court found that in order to place one of the flyers, someone would have to ascend a set of stairs, walk across the victim's porch, and open the screen door. The second flyer was folded and inserted into a victim's mailbox, located next to her front door. The U.S. Supreme Court has concluded that "true threats" are not protected speech. The primary interests identified by the Court as the basis for its conclusion are " 'protect[ing] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' " Id., 538 U.S. at 360, 123 S.Ct. 1536 (plurality opinion) (quoting R.A.V., 505 U.S. at 388, 112 S.Ct. 2538 ). An approving invocation of the history and goals of the Klan or the act of cross burning in a public debate about racial justice, or even a protest in the town park, might be deeply unsettling and disturbing, but would not rise to the level of constitutionally unprotected speech. But an anonymous flyer with imagery deeply associated with extreme violence toward *849 racial and ethnic minorities distributed exclusively to a member of a racial or ethnic minority in a primarily white, nonhispanic community inside the resident's screen door would reasonably engender particular fear if part of the message conveyed was, "I have stood here, on the threshold of your home. You don't know who I am, but I know who you are and where you live."
¶ 81. In other contexts, courts have consistently recognized the particular privacy interest people enjoy in their homes and the immediate surroundings. State v. Blow, 157 Vt. 513, 518, 602 A.2d 552, 555 (1991) (invoking "deeply-rooted legal and societal principle that the coveted privacy of the home should be especially protected"); see also Frisby v. Schultz, 487 U.S. 474, 484, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) ("Our prior decisions have often remarked on the unique nature of the home ... and have recognized that preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value." (quotations and alterations in original omitted) ); Rowan v. U.S. Post Office Dep't, 397 U.S. 728, 737, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) ("The ancient concept that a man's home is his castle into which not even the king may enter has lost none of its vitality ...." (quotations omitted) ). Even in cases in which the U.S. Supreme Court has struck down restrictions on "door-to-door" advocacy, the Court has acknowledged the significance of privacy interests in one's home:
Of all the methods of spreading unpopular ideas, (house-to-house canvassing) seems the least entitled to extensive protection. The possibilities of persuasion are slight compared with the certainties of annoyance. Great as is the value of exposing citizens to novel views, home is one place where [people] ought to be able to shut [themselves] up in [their] own ideas if [they] desire[ ]."
....
There is, of course, no absolute right under the Federal Constitution to enter on the private premises of another and knock on a door for any purpose .... We cannot say ... that door-to-door canvassing and solicitation are immune from regulation ... whether the purpose of the regulation is to protect from danger or to protect the peaceful enjoyment of the home.
Hynes v. Mayor & Council of Borough of Oradell, 425 U.S. 610, 619, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (quotation omitted) (first alteration in original). I do not mean to suggest that the distribution of political flyers to someone's doorstep is not constitutionally protected; it clearly is, subject to reasonable restrictions. But the distribution of literature extolling the Ku Klux Klan, when delivered only to two targeted individuals who are racial or ethnic minorities, is especially threatening when delivered inside the curtilage of their homes.
¶ 82. This is a difficult and close case. I admit that most, though not all, of the reported appellate decisions dealing with true threats involve more explicit threats of violence, or at least more strongly implied suggestions of extreme violence or death. The law surrounding "true threats" remains unsettled on many issues.[19] And just as threats delivered to one's doorstep may be particularly unsettling, political leafleting and door-to-door canvassing are time-honored, vital and constitutionally protected means of sharing heartfelt views on matters of religion, politics, human rights, and other subjects. The potential *850 tension in this case between the values of free expression and personal security is real.
¶ 83. Moreover, there is much in this record to suggest that defendant's actions did not amount to true threats, and that a properly instructed jury would have concluded that his flyers, while repugnant, were constitutionally protected. If he distributed the flyers more broadly, as he claimed, his actions clearly fell on the "political advocacy" side of the somewhat elusive line between unprotected speech and protected advocacy. Although it could conclude otherwise, a jury could well have been persuaded that defendant lacked the requisite intent to threaten-that he was more of a bumbling patron of an organization that gave him a sense of purpose, albeit a misguided one, and that he did not intend to actually threaten anyone. The jury may well have decided that as unsettling as the flyers were in light of their manner of distribution, they did not amount to true threats as defined in constitutional terms. And, as I noted above, I believe the State's ability to satisfy the public nuisance requirement of the disorderly conduct statute may have been compromised by its necessary reliance on the highly targeted, nonpublic nature of defendant's placement of flyers at only two homes.
¶ 84. But I am constrained by the record as it comes to us and the standard of review that applies, and for the reasons set forth above, I respectfully dissent.
¶ 85. I am authorized to state that Chief Justice Reiber joins this dissent.

I am deliberately avoiding the terms "speech" and "conduct" in my discussion, as I find the speech-conduct distinction as sometimes articulated unhelpful and circular. See, e.g., R.A.V. v. City of St. Paul, 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("In other words, the exclusion of 'fighting words' from the scope of the First Amendment simply means that, for purposes of that Amendment, the unprotected features of the words are, despite their verbal character, essentially a 'nonspeech' element of communication."); Cohen v. California, 403 U.S. 15, 27, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (Blackmun, J., dissenting) (describing defendant's wearing a jacket bearing the words "fuck the draft" as "mainly conduct and little speech"). When some courts and commentators describe words that can be proscribed consistent with the First Amendment as "conduct," the label takes on the character of a legal conclusion rather than an empirical description. See generally, E. Volokh, Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones, 90 Cornell L. Rev. 1277, 1347-48 (July 2005) (describing various rationales courts and commentators have used to describe speech as "conduct" on the basis of its content and arguing that the only sustainable speech-conduct distinction is that between the communicative and noncommunicative aspects of speech).

For that reason, I find the majority's attempt to reinterpret Albarelli unpersuasive. Ante, ¶ 30. The Court's recognition in that case that "[l]anguage may be treated as a threat to harm a victim" makes total sense when the harm targeted by the statute is the impact of the threat.

The purpose of the disorderly conduct statute-protecting against a public disturbance-is different from that of a probation condition-promoting individual rehabilitation. But insofar as one issue in probation condition cases is whether the prohibition of "threatening behavior" gives ample notice of what is proscribed, our understanding of "threatening behavior" in the probation condition context could be illustrative.

The majority suggests that in Sanville this Court held that verbal threats do not violate § 1026(a)(1). I respectfully disagree. The Court in Sanville concluded that the particular threats at issue in that case did not amount to "violent and threatening behavior" but did not state that threats of violence communicated through words unaccompanied by physical gestures can never run afoul of § 1026(a)(1).

In 2014, the Legislature established the offense of "aggravated disorderly conduct," codified at 13 V.S.A. § 1026a. 2013, No. 150 (Adj. Sess.), § 4. This new offense is directed at many of the actions listed in § 1026, but rather than requiring that they be undertaken with an intent to cause "public inconvenience or annoyance" or recklessly create a risk thereof, the offense targets several of the same actions as the disorderly conduct statute-fighting, violent, tumultuous or threatening behavior, unreasonable noise, etc.-when undertaken as a course of conduct with the intent to cause a specific person"inconvenience or annoyance," or "to disturb the person's peace, quiet, or right of privacy." 13 V.S.A. § 1026a. Although the aggravated disorderly conduct offense tracks many of the elements of the regular disorderly conduct statute, it includes an additional prong applicable when, with the requisite intent, the actor "threatens bodily injury or serious bodily injury, or threatens to commit a felony crime of violence." Id. § 1026a(a)(4). The addition of this language might suggest that the Legislature in 2014 believed that the existing disorderly conduct statute, § 1026, did not reach "threats," but the legislative history does not bear this out.
The "threat" element of § 1026a(a)(4) got scant attention through House and Senate committee hearings, and nobody in either committee testified that the language was added to expand the limited reach of the "threatening behavior" prong. Instead, the primary goal of the new offense was to create an offense with greater penalties than the disorderly conduct statute to address behavior that may not meet all the elements of stalking but is nonetheless targeted at an individual and involves a course of harassing conduct. The penalty for violating the new statute is up to 180 days imprisonment or a $2000 fine-more than three times the incarcerative penalty for ordinary disorderly conduct, first offense, and four times the financial penalty. If anything, the legislative history suggests a desire to provide the State a broad range of tools, consistent with constitutional limitations, to combat behavior on the harassment-threat spectrum. See generally 2013, No. 150 (Adj. Sess.), Hearings on S.195 Before Senate Judiciary Comm. and House Judiciary Comm. (Vt. Feb. 19, 27, 2014, Apr. 11, 2014, May 30, 2014).

In State v. Gagne, we upheld on plain error review a jury instruction that described the threat required for "physical menace" to be "a threat, by word or act, to inflict physical injury upon a person." 2016 VT 68, ¶¶ 29-32, 202 Vt. 255, 148 A.3d 986. The threat in that "road rage" case arose from the defendant's chasing the victims through town, eventually pulling up next to their truck and pointing a rifle at them, and the defendant's challenge on appeal focused on whether the jury instruction properly required the jury to assess the threat of the "physical menace" from the perspective of a reasonable person. We did not discuss or rule on the trial court's instruction suggesting that words could amount to a "physical menace."

If a defendant actually possesses such a weapon, this action would support a charge of aggravated assault with a deadly weapon pursuant to 13 V.S.A. § 1024(a)(5). However, this charge is only applicable if the defendant is actually armed with such a weapon.

The relevant section of the Model Penal Code provides that a person is guilty of disorderly conduct if, "with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," the person "engages in fighting or threatening, or in violent or tumultuous behavior." Model Penal Code § 250.2(1)(a). Our statute prohibits actions undertaken with a similar purpose-although we exclude an intent to cause public "alarm" from the intent element-and directs the analogous prong of the statute at "engag[ing] in fighting or in violent, tumultuous, or threatening behavior." 13 V.S.A. § 1026(a)(1). One can imagine various explanations for the Vermont Legislature's rewording of the Model Penal Code language to refer to "threatening behavior" as opposed to using the term "threatening" as a gerund. Perhaps, consistent with the majority's opinion, the Legislature adopted the phrase "threatening behavior" in order to limit the universe of threats subject to prosecution to only those communicated through physical actions. Alternatively, and equally plausibly, the Legislature may have intended to be more expansive than the Model Penal Code by providing that the threats in question may be communicated by means other than words alone-including by physical gestures or some combination of words and physical actions. Or perhaps the Vermont Legislature adopted different phraseology because it found the Model Penal Code language clunky, with no intent to substantively depart from the Model Penal Code's description of the scope of the offense. In the absence of any evidence resolving this question, I cannot ascribe significance to the difference in wording between the Vermont statute and the Model Penal Code provision on which it is based.

This raises questions as to whether the State's charge would have survived a motion to dismiss on this factor. Two of the most significant factors in support of the State's claim that defendant's communications amounted to "true threats"-that they were targeted at only minority individuals in a predominantly white, nonhispanic neighborhood, and they were delivered inside or by the doors of the victims' homes-undermine the State's claim that defendant's actions created a public nuisance. The fact that, once publicized in the media, defendant's flyers caused great public outcry cannot be sufficient to satisfy the "public nuisance" requirement at the heart of the disorderly conduct statute. If that were so, any act of private brawling or private tumultuous behavior could be deemed a public nuisance if the news coverage of the event generated public outcry. Had defendant blanketed the neighborhood with flyers, the State's case as to public nuisance would be far more compelling; even though the flyers may have all been distributed inside screen doors, the scale of distribution could reasonably have supported the inference of intent to cause public disturbance, or recklessness in doing so. But if defendant had blanketed the predominantly white neighborhood with these Ku Klux Klan recruitment flyers-without the targeting relied upon by the State to support its prosecution-his communications would not qualify as "true threats" as opposed to "political hyperbole." See Watts, 394 U.S. at 708, 89 S.Ct. 1399 (describing protester's statement that if forced to carry a rifle "the first man I want to get in my sights is L.B.J." as political hyperbole). Because this case comes to us on a conditional plea, and defendant has preserved his right to appeal only those issues raised in his motion to dismiss, this issue is not before us.

"Context" considerations may run the other way as well, preserving constitutional protection for statements that on their face are explicitly threatening. See, e.g., State v. Krijger, 313 Conn. 434, 97 A.3d 946, 960-61 (2014) (concluding that in context of angry interaction following town hearing, defendant's menacing statements about town lawyer suffering same fate as lawyer's son who had recently been injured in car accident were more reasonably understood as hurtful blow leveled in frustration, and not as serious expression of intent to cause lawyer harm of nature suffered by his son); Watts, 394 U.S. at 708, 89 S.Ct. 1399 (concluding that in context defendant's expression of intent to shoot President if conscripted into army was "very crude offensive method of stating a political opposition to the President" and could not be reasonably interpreted otherwise).

For a helpful analysis, see generally M. Strasser, Advocacy, True Threats, and the First Amendment, 38 Hastings Const. L.Q. 339 (2011).